IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 11, 2005

**STATE OF TENNESSEE v. JONATHAN HARRIS**

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7407     Joseph H. Walker, Judge**

---

**No. W2004-00243-CCA-R3-CD  - Filed May 23, 2005**

---

The defendant, Jonathan Harris, was convicted by jury of attempted second degree murder, a Class B felony; voluntary manslaughter, a Class C felony; and theft of property valued between $10,000 and $60,000, a Class C felony.  The trial court sentenced the defendant as a Range I, standard offender to twelve years for the attempted second degree murder conviction, six years for the voluntary manslaughter conviction, and five years for the theft of property conviction.  The trial court ordered the sentences to run consecutively for an effective sentence of twenty-three years.  On appeal, the defendant argues: (1) the trial court erred in not suppressing the defendant's statements and journal; (2) the evidence was insufficient to support his convictions; (3) and the trial court erred in imposing an excessive  sentence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Clifford K. McGown, Jr. (on appeal) and Julie K. Pillow, (counsel at trial and of counsel on appeal) Assistant Public Defender, for the appellant, Jonathan Harris.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Facts**

The following evidence was presented at trial.  On December 13, 2002, the defendant and his girlfriend, Catherine Covington, were living together with the defendant's step-mother, Debbie Harris.  After drinking most of the evening, the defendant and Ms. Covington retired to their

bedroom where a fight ensued. At some point after the fight, Ms. Covington left the bedroom and asked Mrs. Harris for help, explaining that she had been beaten by the defendant. Mrs. Harris noticed Ms. Covington was crying and had cuts and bruises on her face. Mrs. Harris later observed scratches on the defendant's face.

Around 12:30 a.m. on December 14, 2002, David Harris, the defendant's brother and Ms. Covington's former boyfriend, arrived at the house. Earlier that evening, David Harris had been out with his friends Ben Green and Lisa Norman. David Harris had borrowed Mr. Green's Silverado truck to drive around town and decided to ask if the defendant and Ms. Covington wanted to join him. The defendant and Ms. Covington agreed to go along with David Harris and the three of them headed out to the bluff area to drink. Ms. Covington left wearing only red sweat pants and a white t-shirt, and the defendant left wearing only boxers and a shirt. However, after fifteen minutes, the group drove back to the house and the defendant went inside to change. While inside the house, the defendant got dressed.

Once the defendant got back in the truck, the group headed out to find some beer. As they were driving along, David Harris looked over at the defendant and Ms. Covington and thought he saw them hugging. A split second later, David Harris' body went numb and he blacked-out. Moments later, when David Harris regained consciousness, he felt the defendant sliding him over towards the passenger side of the truck, and heard the defendant call Ms. Covington some names. He also heard the defendant say "I finally got you." Five minutes later, the defendant stopped the truck, pulled Ms. Covington's body out of the truck, then pulled David Harris out of the truck. After the defendant drove off in the truck, David Harris tried to move but found his body unresponsive. David Harris also called out to Ms. Covington but got no response.

After about six hours, in the early morning hours, Everette Gail Jackson and his wife were driving down Craig Road heading toward Ripley when they were flagged down by two men. After being directed to the area where Ms. Covington and David Harris were lying, Mr. Jackson heard a cry for help. As Mr. Jackson approached the area, he saw Ms. Covington and David Harris lying on the ground. While David Harris was fully clothed, the only clothing covering Ms. Covington was her red sweat pants. After looking at Ms. Covington more closely, Mr. Jackson saw that the back of her head looked like it had been "blowed off." Mr. Jackson noticed blood all over Ms. Covington's head and body and saw a .38 revolver lying on the ground not far from where David Harris and Ms. Covington lay. Mr. Jackson also noticed that David Harris had a puncture wound in the side of his neck, resembling a bullet hole. Responding to David Harris' plea for help, Mr. Jackson flagged down a woman and asked her to call 911.

Emergency paramedics responded to the 911 dispatch. Upon reaching the scene, both Ms. Covington and David Harris were checked for vital signs. It was determined that Ms. Covington was dead. However, David Harris was alive and airlifted to a hospital. It was determined that David Harris suffered a spinal cord injury from a gunshot wound to his neck. When asked what happened, David Harris stated that he was shot by his brother.

Mary Cubine, a 911 dispatcher, received a call from the defendant around 12:45 on December 14, 2002, whereupon the defendant told her that he wanted to turn himself in. Ms. Cubine told the defendant to find a police officer. Later, Ms. Cubine learned of Ms. Covington's death.

The defendant was later arrested and taken into custody by police in Texas. After being arrested and advised of his Miranda rights, the defendant confessed in writing to shooting his girlfriend and brother. Later the defendant was transported back to Lauderdale County. After being advised of his Miranda rights for the second time, he wrote out another statement to police. The defendant's statement stated in relevant part that, "[he] took the pistol out of the jacket pocket that she had on, placed it to her head and pulled the trigger. Then [he] turned the gun on [his] brother."

An autopsy was performed on Ms. Covington. From the autopsy, it was determined that Ms. Covington died from a gunshot wound to the head. The autopsy also revealed that Ms. Covington had multiple bruises on her arms and legs and was legally intoxicated at the time of her death. A bullet fired from the .38 revolver was removed from Ms. Covington.

The Silverado truck and the defendant's clothing were also brought back to Lauderdale County. After inspecting the truck, police investigators recovered a bullet shot from a .38 revolver. Firearm and ballistic tests confirmed that the bullet found in the truck and removed from Ms. Covington was fired from the same .38 revolver found at the crime scene. After examination of the defendants's clothing, investigators found blood stains on them. DNA tests of the blood on the defendant's clothing revealed that the blood came from Ms. Covington and David Harris.

The jury convicted the defendant of attempted second degree murder of David Harris, voluntary manslaughter of Ms. Covington, and theft of property valued between $10,000 and $60,000. The trial court sentenced the defendant as a Range I, standard offender to twelve years for the attempted second degree murder conviction, six years for the voluntary manslaughter conviction, and five years for the theft of property conviction. The trial court ordered the sentences to run consecutively for an effective sentence of twenty-three years.

## II. Analysis

### A. Motion to Suppress

The defendant argues that his statements to police and writings found in his journal should have been suppressed. Specifically, he claims to have been suicidal or heavily medicated, or both, when giving statements to law enforcement authorities. Regarding his journal, the defendant asserts that the journal was his private property and he was unaware that it would be used against him.

At the suppression hearing, Investigator Herron testified that he was assigned the task of picking the defendant up in Texas and transporting him back to Lauderdale County. Investigator Herron stated that upon meeting the defendant he advised the defendant of his Miranda rights and the defendant signed a waiver. Investigator Herron testified that Texas law enforcement authorities

informed him that the defendant had already written out a statement after being advised of his Miranda rights.

Investigator Nelson testified that he was also informed by Texas authorities that the defendant had been advised of his Miranda rights prior to giving a statement. Investigator Nelson testified that the Texas authorities had videotaped the process. The videotape was offered into evidence and reviewed by the trial court. Investigator Nelson testified that when he met with the defendant at the Lauderdale County Justice Center, he advised the defendant of his Miranda rights and the defendant signed a waiver. After signing the waiver, Investigator Nelson asked the defendant if he wanted to give a statement. In response, the defendant told him that he had already wrote out a statement in Texas. Investigator Nelson asked the defendant if he could write out another statement. Investigator Nelson testified that defendant then wrote out a second statement.

Investigator Nelson testified that although the defendant had attempted suicide he was not medicated during the time he was asked to write out a second statement. Investigator Nelson further testified that the defendant did not appear preoccupied or confused during the time he was asked to write out a statement. The State submitted into evidence the defendant's statements and journal; the waiver forms signed by the defendant; a written narrative made by the arresting officer in Texas; and the videotape.

During the suppression hearing, the defendant claimed that he was intoxicated when he wrote out his statement to police in Texas and medicated when he wrote out his statement to police in Tennessee. However, the defendant admitted that he remembered the six hundred mile drive to Texas, most of the events surrounding his arrest, and the fact the he was able to write out a detailed statement and read it aloud to the Texas authorities. He also admitted that he was advised of his rights by the Texas and Tennessee authorities and that no one forced him to write a statement. In addition, he admitted that he understood his rights and remembered signing the waiver forms before writing out his statement for authorities in Tennessee.

At the conclusion of the suppression hearing, the trial court found that the defendant freely and voluntarily made written statements to authorities in Texas and Tennessee after being advised of his Miranda rights. The trial court also found that the defendant's written statements from his journal were admissible for impeachment purposes because the defendant failed to show why these statements should be suppressed other than the fact that they were his private thoughts. As a result, the trial court denied the defendant's motion to suppress.

Both the United States and Tennessee Constitutions protect a defendant from compelled self-incrimination. See U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, government authorities are prohibited from using statements made by the defendant during custodial interrogation unless the defendant has been previously advised of his constitutional right against compulsory self incrimination and right to an attorney. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily and knowingly made is determined by the totality of the circumstances under which the right was waived. See State v. Middlebrooks, 840 S.W.2d 317, 326

(Tenn. 1992). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather, coercive police activity is a necessary predicate to finding that a confession is not voluntary." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citations and internal quotations omitted).

When reviewing the trial court's decision on a motion to suppress, this Court conducts a *de novo* review of the trial court's conclusions of law and application of law to facts. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). However, the trial court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. See State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Lawrence, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).

From our review of the record, we initially note that the defendant's argument regarding the suppression of his journal is moot. The journal was never introduced at trial. Thus, there is no error to review on appeal. With respect to the defendant's statements admitted at trial, the evidence in the record does not preponderate against the trial court's findings. The record in this case shows that the defendant gave inconsistent testimony regarding whether he was medicated or intoxicated at the time he waived his Miranda rights. Moreover, the defendant offered no evidence of any police coercion. In contrast, the State's evidence and the defendant's own admissions support the trial court's findings that the defendant voluntarily and knowingly waived his Miranda rights before making statements to police. Therefore, we conclude that the trial court properly denied the defendant's motion to suppress.

## B. Sufficiency of the Evidence

The defendant argues that the evidence does not support the jury's verdict. Specifically, the defendant asserts that he lacked the mental state to be guilty of second degree murder. While not entirely clear, the defendant seems to base this argument on testimony from his sentencing hearing.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "reasonable trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R.App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the States' witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is

entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558; Tuggle, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002); Bland, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. See State v. Elkins, 102 S.W.3d 581, 582 (Tenn. 2003); Reid, 91 S.W.3d at 277.

Initially, we note that the defendant's sufficiency argument based upon evidence not introduced at trial is inadequate. It is well-established that a defendant who intends to introduce expert testimony relating to a mental disease, defect, or any other mental condition bearing upon the issue of guilt must provide written notice to the State and file a copy with the court clerk. Tenn. R. Crim. P. 12.2(b). A failure to comply may result in the exclusion of the expert testimony. Id. at 12.2(d). In addition, "failure by the defendant to raise a defense, make objections, or to make requests which must be made prior to trial results in waiver. Id. at 12(f). In the instant case, prior to trial, the defendant did not give notice of intent to introduce evidence of any mental condition bearing on the issue of guilt. More importantly, at trial, the defendant failed to introduce any evidence supporting a mental condition bearing on the issue of guilt. It is well-settled that a defendant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal. See State v. Adler, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001).

Contrary to the defendant's assertions, we conclude that the evidence supports his convictions beyond a reasonable doubt. The evidence presented at trial clearly establishes that the defendant attempted to murder his brother by shooting him in the neck, shot and killed his girlfriend, and stole a truck valued over $10,000. Therefore, this issue is without merit.

### C. Sentencing

The defendant argues that the trial court erred in imposing an excessive sentence. Specifically, the defendant asserts that the trial court erred in finding no statutory mitigating factors applied and ordering his sentences to run consecutively.

Before a trial court sentences a convicted defendant, it must consider (1) the evidence received at the trial and/or sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). The trial court is also required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which

the mitigating and enhancement factors have been evaluated in determining the sentence.  Imfeld, 70 S.W.3d at 704-05.

This Court's review of a challenged sentence is a *de novo* review of the record with a presumption that the trial court's determinations are correct.  Tenn. Code Ann. § 40-35-401(d).  This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.  State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999).  The defendant has the burden of showing that the sentence imposed by the trial court is improper.  Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments.  However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness.  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In challenging his sentence, the defendant argues only that the trial court erred when it failed to apply mitigating factor (8), that the defendant was suffering from a mental or physical condition that significantly reduced his culpability.  At the sentencing hearing the defendant presented the testimony of Dr. Wyatt Lee Nichols, a clinical psychologist, whose evaluation of the defendant suggested that the defendant suffered from depression and bipolar illness.  According to Nichols' testimony, the defendant showed signs of depression about six years prior to committing the criminal offenses.  In June 2002, the defendant started drinking heavily, then "once [the defendant] was arrested in December, [he showed] more overt signs of psychosis, hallucinations, having some of these symptoms prior to December."  Dr. Nichols stated that he believed that the defendant was intoxicated prior to committing the offenses based on the fact that the defendant told him that "he and Ms. Covington consumed about a gallon of whiskey together. . . [and] had several Xanax" prior to the evening when his brother came over, "then they started drinking again."  Dr. Nichols testified that the defendant's family had a history of bipolar illness and that the defendant was presently treated with antipsychotic and antidepressant medications.  Dr. Nichols rendered his opinion that he believed the defendants's bipolar illness was a contributing factor to the crime involved.

At the conclusion of the sentencing hearing, the trial court stated the following:

> The Court finds there are no statutory mitigating factors to apply.  I do consider the testimony heard hear today and the report that was filed by Dr. Nichols, but the Court believes that neither depression nor bipolar excuses the acts in this case of shooting one person in the head and another in the neck.  Drinking and consuming drugs together is a choice and doesn't excuse the acts.  The act of going back into the house to get the gun, the shooting at close range, a contact wound to the head, then fleeing to Texas, all indicate purposeful acts on the part of the defendant.

> So the Court finds that the enhancing factors greatly outweigh the mitigating factors.

In this case, the record establishes that the trial court considered the defendant's mitigation evidence but declined to give it weight. Although the trial court did not specifically assign weight to the defendant's mitigating evidence, the trial court sufficiently articulated its reasons for disregarding the mitigating evidence and gave indication that the enhancing factors greatly outweighed the mitigating factors. Our review of the evidence supports the trial court's decision.

First, we note that the burden of proving applicable mitigating factors rests on the defendant. See State v. Joshua Aaron Roush, No. E2002-00313-CCA-R3-CD, 2003 WL 354465 (Tenn. Crim. App., at Jackson, Feb. 18, 2003), perm. app. denied, (Tenn. June 30, 2003). The defendant must not only establish the presence of a mental condition significantly reducing culpability, but also a causal nexus between his condition and the offense charged. See State v. Robert James Yoreck, III, No. M2004-01289-CCA-RM-CD, 2003 WL 23613823, at *4 (Tenn. Crim. App. at Nashville, June 29, 2004); State v. Betty W. Norman, No. 01C01-9805-CC-00230, 1999 WL 695565, at *11 (Tenn. Crim. App., at Nashville, Sept. 9, 1999). Although the defendant submitted some evidence of bipolar illness and depression, the evidence submitted did not support how the defendant's mental condition reduced his culpability on the date he knowingly shot two victims. Furthermore, the evidence submitted appears to support the fact that the defendant was intoxicated during the time he committed the offenses rather than suffering from a mental condition. With regard to the application of mitigating factor (8), voluntary use of intoxicants does not fall within the purview of this factor. See Tenn. Code Ann. § 40-35-113(8). Therefore, the defendant's evidence supporting his volitional use of intoxicants at the time the offenses were committed fails to support the application of mitigating factor (8). Consequently, we agree with the trial court that the proof does not support application of mitigating factor (8).

The defendant also challenges the trial court's imposition of consecutive sentencing. As a general rule, a trial court may exercise its discretion and impose consecutive sentencing after considering one or more of the statutory criteria set forth in Tennessee Code section 40-35-115. Because these criteria are stated in the alternative, the trial court need only find one of the criteria present to support a determination of consecutive sentencing. However, if the trial court imposes consecutive sentencing based solely upon a finding that the defendant is a dangerous offender pursuant to Tennessee Code Annotated section 40-35-115(b)(4), the court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn.1995). See also Imfeld, 70 S.W.3d at 708 (citations omitted).

In ordering consecutive sentencing, the trial court determined that the defendant qualified as a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4). The trial court noted that it considered: the presentence report, including victim impact statements and the defendant's statements to police; the testimony at the hearing, and the nature and characteristics of the criminal conduct involved. The trial court found that the facts presented at trial and at the sentencing hearing showed that the defendant had "no hesitation about committing a crime in which the risk to human life was high." The court also found that consecutive sentencing was "reasonably related to the severity of the offenses committed," necessary to protect the public from further

criminal acts by the defendant who "resorted to the most extreme aggravated criminal conduct," and "congruent with the principles of sentencing."

Upon review of the record, we determine that the trial court considered the sentencing principles and all relevant facts and circumstances attendant to finding that the defendant qualified as a dangerous offender. The record reveals that the defendant shot and killed his girlfriend, then shot his brother in the neck. The defendant dumped their bodies on the side of the road. Because of the defendant's violent activity, the defendant's girlfriend died from a gunshot wound to the head, and the defendant's brother suffered partial paralysis. Accordingly, we affirm the trial court's imposition of consecutive sentencing.

### III. Conclusion

Based upon our review of the record, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE